1   Alan S. Gutman, SBN 128514
    John Juenger, SBN 225201
2   LAW OFFICES OF ALAN S. GUTMAN
    9401 Wilshire Boulevard, Suite 575
3   Beverly Hills, CA 90212-2918
    Telephone: 310-385-0700
4   Facsimile: 310-385-0710
            email: alangutman@gutmanlaw.com
5                 jjuenger@gutmanlaw.com

6   Attorneys for Defendant and Counter-Claimant
            THIERRY GUETTA a/k/a MR. BRAINWASH
7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  GLEN E. FRIEDMAN,                )   Case No. CV10-0014 DDP (JCx)
                                     )
12          Plaintiff,               )   **DEFENDANT THIERRY GUETTA'S**
                                     )   **OPPOSITION TO PLAINTIFF GLEN E.**
13  vs.                              )   **FRIEDMAN'S MOTION FOR SUMMARY**
                                     )   **ADJUDICATION**
14  THIERRY GUETTA a/k/a MR.         )
    BRAINWASH, and DOES 1 through    )   [FILED CONCURRENTLY WITH STATEMENT
15  10, inclusive,                   )   OF GENUINE ISSUES; DECLARATIONS OF
                                     )   THIERRY GUETTA AND ALAN S. GUTMAN]
16          Defendants.              )
    _____    )   **Date:  May 9, 2011**
17  AND RELATED COUNTER-CLAIM.       )   **Time: 10:00 a.m.**
                                     )   **Ctrm: 3**
18  _____    )
                                         **HON. DEAN D. PREGERSON**
19                                       **UNITED STATES DISTRICT JUDGE**

20

21

22

23

24

25

26

27

28

GUETTA\MSA OPP P&A                                      **DEFENDANT'S OPPOSITION TO**
                                                       **MOTION FOR SUMMARY ADJUDICATION**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Glen E. Friedman ("Friedman") has failed to meet his burden of production in his motion for summary adjudication on his claim for copyright infringement against Defendant Thierry Guetta ("Guetta"). Friedman does not provide any evidence or argument suggesting that Guetta's use of aspects of a photograph Friedman took in 1985 of the hip-hop group Run-DMC (the "Photograph") is substantially similar to the protected elements of the Photograph. Friedman argues that he does not need to address this essential element of copyright analysis because Guetta has admitted to "copying." This is simply not the case. Guetta has only admitted to using certain aspects of the Photograph and has provided evidence that those aspects were altered in various manners, including color, tone, sizing, etc. This does not constitute an admission of copying for copyright purposes. Moreover, the two cases Friedman cites in support of his argument that one need not prove substantial similarity when the defendant has admitted to copying concern the publication of verbatim quotes from unpublished literary sources in subsequent pieces of literature. Obviously, copying exact language from one literary source and printing it in another is completely different from the incorporation of some aspects of a Photograph (that have been altered) into different artistic mediums. Additionally, Friedman does not address whether Guetta's works constitute fair use. Despite having been aware that Guetta would argue fair use, Friedman does not offer any explanation for his failure to address this key component of copyright infringement. Friedman has therefore failed to meet his burden of production and the motion for summary adjudication must be denied on those grounds alone.

Out of an abundance of caution, this opposition also sets forth evidence and analysis demonstrating that Guetta's works do not constitute copyright infringement as they are not substantially similar to the protected aspects of Friedman's Photograph and that Guetta's use of the Photograph was fair, arguments that are also set forth in Guetta's motion for summary judgment, scheduled to be heard on the same date as the instant

1  motion.

2  **II.   STATEMENT OF FACTS**

3     **A.   BACKGROUND AND WORKS INCORPORATING THE PHOTOGRAPH**

4         Guetta is a world renowned artist that sometimes goes by "Mr. Brainwash."

5  Defendant's Additional Material Fact ("DMF") No. 1. Guetta's first major art showing, which

6  was called "Life is Beautiful," was a massive art installation at a former CBS studio in

7  Hollywood, California.  DMF No. 2. "Life is Beautiful" ran from June 18, 2008 until August

8  31, 2008. DMF No. 3. The show included about 200 works Guetta created, including

9  paintings, sculptures, a 20 foot tall robot constructed out of televisions and metal, and

10  various other works of differing sizes and mediums. DMF No. 4.  Guetta was not paid to

11  put on the show, rather, he paid to rent the space, for demolition, security and so on. DMF

12  No. 5. At all times, admission to "Life is Beautiful" was free to the public and no

13  concessions were sold. DMF No. 6. Other than selling his art, Guetta did not offer any

14  goods or services in connection with the "Life is Beautiful" show and could not profit in any

15  other manner therefrom. DMF No. 7. In addition to the other approximately 200 pieces

16  were a few works Guetta created in part by using the unprotectable aspects of the

17  Photograph of Run-DMC taken by Friedman of the hip-hop group Run-DMC. DMF No. 8.

18         The Photograph consists of the three members of Run-DMC staring at the camera

19  and posing with bravado: one of the group's members is cupping his fist with his other

20  hand and another member has his arms folded. DMF No. 9. Each member's face has a

21  serious look that may described as "tough." Id. Each member of Run-DMC is wearing a

22  black Stetson hat, a style of dress the group was and is well known for. DMF No. 10. The

23  background of the Photograph is a brick building in Hollis, Queens. DMF No. 11.

24         The works Guetta created using the Photograph were created in four distinct

25  manners. What shall be referred to herein as the "Old Photo Work" was created out of a

26  19th century photograph of a family of four people. DMF No. 12. Guetta purchased the

27  19th century photograph at a flea market in Paris. DMF No. 13. After being scanned into

28  a digital format, two of the family members were removed and replaced with the images

1  of two of the members of Run-DMC from the digital image of the Photograph.[1] DMF No.

2  14. The 19th century photograph made up the majority of the Old Photo Work and other

3  than the removal of two of the family members, essentially no aspects from the older

4  photograph were omitted.  DMF No. 16.  Guetta also caused one of the Stetson hats that

5  the members of Run-DMC were wearing to be placed on one of the unknown persons in

6  the Old Photo Work so as to make it appear that he was wearing the same style of hat.

7  DMF No. 17. The images of the two Run-DMC members from the Photograph were

8  digitally altered so as to make them more slender, smaller and to change their relative

9  positions, thereby making their inclusion in the older photograph more spatially appropriate.

10 DMF No. 18. Additionally, while the images of Run-DMC were crisp in the Photograph, the

11 two members' features were made more dull in the Old Photo Work so as to create the

12 sense that the Run-DMC members were present with the family when the 19th century

13 photograph was taken. DMF No. 19. The entire image in the Old Photo Work, including the

14 two members of Run-DMC, had a sepia tone, whereas the Photograph was a more

15 standard black and white. DMF No. 20. An image of an oval near the Old Photo Work's

16 perimeter gave the piece the appearance of an old photograph that had been in a frame

17 with an oval window for some time and subsequently removed. DMF No. 21. None of the

18 background from the Photograph was used in the Old Photo Work. DMF No. 22.

19 Guetta created prints of the Old Photo Work for sale, some of which were sold

20 during the two and a half month run of the "Life is Beautiful" show and some of which were

21 sold on Guetta's website. DMF No. 23. Guetta has not offered the Old Photo Work prints

22 for sale since well before the instant litigation began. DMF No. 24. Postcards incorporating

23 the image were created, but were not used for promotion of the show and were instead

24 given as a memento to people after they attended the show. UF. No. 25. 46 other

25 postcards bearing images of Guetta's artwork that did not incorporate the Photograph were

26 also created and distributed in the same manner. DMF No. 26.

27

28     [1]     Any of the digital alterations herein referenced were performed by a
graphic artist at Guetta's direction. DMF No. 15.

1    The second category of work incorporating the Photograph was a "one-off" (only one

2    was created, no reproductions were made) depicting Run-DMC made from vinyl shards of

3    broken records (the "Broken Records Work"). DMF No. 27. To create the Broken Records

4    Work, Guetta caused a digital image of the Photograph to be altered so as to remove most

5    of the detail from its subjects, leaving an outline of the group's features. DMF No. 28. Any

6    shadings and/or subtleties created by Friedman's artistic decisions as a photographer

7    (such as lighting, shutter-speed, etc.) were entirely eliminated. Id. The background of the

8    Photograph was discarded. DMF No. 29. Guetta then had the image projected onto a large

9    piece of wood and painted the image onto the wood.  DMF No. 30. Thereafter, Guetta

10   glued more than 1,000 pieces of broken phonograph records onto the painted wood. DMF

11   No. 31. The result was a three-dimensional image of Run-DMC created entirely from

12   broken records. DMF No. 32. The use of broken vinyl gave the Broken Records Work a

13   fragmented appearance. DMF No. 33. The Broken Records Work further deviated from the

14   Photograph in that towards the bottom the image of Run-DMC appeared to be dripping.

15   DMF No. 34. The Broken Records Work was never offered for sale. Other than the "Life

16   is Beautiful" show, the Broken Records Work was never displayed or in any manner

17   marketed by Guetta. DMF No. 35.

18   The third category of works incorporating the Photograph involved the use of a

19   stencil (the "Stencil Works"). As with the Broken Records Work, a digital image of the

20   Photograph was altered so as to remove any shading and nuance. DMF No. 36.

21   Additionally, the image was altered so that it could be made into a one piece stencil,

22   meaning Guetta had to make decisions as to whether and how certain features could be

23   incorporated.[2] DMF No. 37. Thereafter, the image was printed on high-quality, rigid paper

24   and Guetta cut the paper to create the stencil. DMF No. 38. As with the other works, the

25

26      [2]      In order to create a single stencil, the artist must ensure that every aspect

27   of the image is connected by a "bridge."  Accordingly, for portions of the image that
     were not near other portions (e.g. a band member's eye), Guetta had to determine how

28   to bridge that feature to others so as to ensure a one-piece stencil could be created.
     DMF No. 37.

5

1  background of the Photograph was not incorporated in any manner. DMF No. 39. Guetta

2  placed the stencil on top of the three canvases with different backgrounds and used black

3  spay paint to superimpose the image of Run-DMC. DMF No. 40. Only the Stencil Work

4  found at Exhibit G, the piece on the white background with graffiti, was ever displayed by

5  Guetta, the other two works were left in storage and never displayed or marketed. DMF No.

6  41. The Stencil Works were never offered for sale in any manner or otherwise used to

7  promote Guetta or his work. DMF No. 42.

8       The fourth and final category of work incorporating the Photograph was a painted

9  banner of the members of Run-DMC (the Banner Work), which was was also a one-off.

10  DMF No. 43. Again, an image incorporating the members of Run-DMC from the

11  Photograph with the shading and other nuances removed was projected onto a canvas and

12  then the image was hand-painted onto the canvas. DMF No. 44. Accordingly, the decisions

13  Friedman made as a photographer, such as lighting and type of film, were not incorporated

14  into the Banner Work, which used only one color (black) of acrylic paint. DMF No. 45. The

15  image of Run-DMC is dripping at the bottom. DMF No. 46.

16       The Banner Work was sold prior to the "Life is Beautiful" show, but was displayed

17  at the "Life is Beautiful" show and during a three-day music festival in Autumn 2008 in New

18  York. DMF No. 47. As with the Old Photo Work, postcards incorporating the image were

19  created, but were not used for promotion of the show and were instead given as a

20  keepsake to people after they attended the show. DMF No. 48.

21       **B.    THE PHOTOGRAPH**

22       Friedman testified that he took the Photograph around November 1985. DMF No.

23  49. Friedman stated that he chose the shoot's location. DMF No. 50. Friedman testified

24  that he did not provide Run-DMC with the hats worn in the Photograph and that Run-DMC

25  had been previously photographed with such hats. DMF No. 51. While Friedman testified

26  that he may have participated in some of the wardrobe choices, he conceded that the cold

27  weather played a role in what Run-DMC was wearing. DMF No. 52. Friedman further

28  testified that the group had often worn matching or similar outfits prior his taking the

6

1   Photograph. DMF No. 53. Friedman stated that he did not develop the Photograph. DMF

2   No. 54. Friedman explained that since Run-DMC's music inspired him, he wanted to

3   express this inspiration to others and inspire them as much as possible by means of the

4   Photograph. DMF No. 55. Friedman testified that no one has told him that they would not

5   license or purchase the Photograph because of Guetta's use. DMF No. 56.

6       There are many photographs of Run-DMC from the 1980's that are similar to

7   Friedman's Photograph, including the style of clothing, pose, demeanor and background.

8   DMF No. 57. Run-DMC's eponymous debut album, which was released the year before

9   the Photograph was taken, depicts two of the members of the group in black Stetson hats

10  giving "tough" looks to the camera in essentially the same vein as they do in the

11  Photograph. DMF No. 58. Friedman does not own any of Run-DMC's rights of publicity.

12  DMF No. 59.

13  **III.    LEGAL ARGUMENT**

14      **A.    FRIEDMAN HAS FAILED TO MEET HIS BURDEN OF PRODUCTION**

15      Friedman, as the party moving for summary adjudication, has the initial burden of

16  establishing that there is "no genuine issue as to any material fact and that the movant is

17  entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); British Airways Bd. v. Boeing

18  Co., 585 F.2d 946, 951 (9th Cir. 1978) ("[The] burden of establishing that there is no

19  genuine issue of material fact lies initially with the moving party ... "). Where the moving

20  party fails to carry his initial burden of production, the opposing party "has no obligation to

21  produce anything ... " Nissan Fire & Marine Ins. Co. v. Gritz Cos., 210 F.3d 1099,

22  1102-1103 (9th Cir. 2000). To warrant summary judgment, a plaintiff must present

23  evidence affirmatively showing that no reasonable jury could find for the non-moving party

24  for all essential elements of its case. Miller v. Glenn Miller Prod., Inc., 454 F.3d 975, 987

25  (9th Cir. 2006).

26      Thus, in moving for summary adjudication on his claim for copyright infringement,

27  Friedman must prove that there is no issue of material fact that Guetta "copied **protected**

28  **elements** of the plaintiff's work." Three Boys Music Corp. v. Bolton, 212 F.3d 477, 481 (9th

1   Cir. 2000) (emphasis added). Copying may be established by showing that the two works

2   "are substantially similar in their protected elements." Metcalf v. Bochco, 294 F.3d 1069,

3   1072 (9th. Cir. 2002).

4         Rather than submitting evidence and argument to demonstrate that Guetta's uses

5   are substantially similar to the protected aspects of the Photograph (and establishing that

6   no reasonable jury could possibly find that their protected elements are not substantially

7   similar), Guetta contends that he does not have to argue substantial similarity, because

8   Guetta supposedly "admits to verbatim copying." Friedman's Motion for Summary

9   Adjudication, 9:16. In support of this argument, Friedman cites Harper & Row Publishers,

10  Inc. v. Nation Enterprises, 471 U.S. 539, 548-549 and Norse v. Henry Holt & Co., 991 F.2d

11  563, 566 (9th Cir. 1993). Both of those cases involved the publication of verbatim quotes

12  from unpublished literary sources in subsequent pieces of literature (thus implicating the

13  right of first publication protection afforded by the Copyright Act). In Harper & Row, the

14  defendant magazine published an article incorporating passages from President Ford's

15  then unpublished memoirs. Norse concerned the incorporation of language from

16  unpublished letters in a William S. Burroughs biography. Friedman does not cite any cases

17  in support of his proposition that do not concern direct copying of language in literary

18  materials.

19        Guetta has not admitted to "copying." Nowhere in the cited deposition testimony or

20  language from the declaration Guetta submitted in support of his Motion for Summary

21  Judgment or, in the Alternative, Partial Summary Judgment does Guetta indicate that he

22  "copied" the Photograph. Rather, Guetta explains how he incorporated certain aspects of

23  the Photograph into his works through various methods depending on which work is being

24  discussed. Each of these methods included substantial alteration of the aspects of the

25  Photograph that were incorporated, such as changing color, tone, clarity, sizing and so on,

26  and incorporating them into a visual medium different than that of a photograph. For

27  instance, Guetta caused an image of the Photograph with all of its nuances removed

28  (leaving essentially an outline) to be projected onto a piece of wood and then painted that

1   image. This is entirely different from copying exact language from one literary source and

2   printing it in another. Guetta did not admit to "verbatim copying." Friedman's argument may

3   hold some weight if Guetta simply glued the Photograph onto his artworks, but that is not

4   what transpired. Unlike the situations in <u>Harper & Row</u> and <u>Norse</u>, where verbatim copying

5   of the copyrighted material was inserted into the infringing works, here Guetta clearly

6   altered the aspects of the Photograph that were incorporated into his works. Friedman's

7   failure to address this is fatal to his summary adjudication motion. Additionally, as

8   Friedman has argued that Guetta's works are "derivative works," a substantial similarities

9   analysis must be undertaken. See <u>Allen v. Academic Games League of America, Inc.</u>, 89

10  F.3d 614, 617 (1996) ("[The plaintiff] asserts that to constitute a derivative work, the

11  infringing work need only incorporate in some form a portion of the copyrighted material.

12  This court, however, has consistently held that to prove infringement, one must

13  demonstrate substantial similarity between the works. <u>Litchfield v. Spielberg</u>, 736 F.2d

14  1352, 1355 (9th Cir.1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817

15  (1985)." Accordingly, Friedman is not absolved from proving substantial similarity between

16  the protected elements of the Photograph and Guetta's use, and his refusal to even

17  attempt to do so constitutes a failure to meet his burden of production. For this reason

18  alone, Friedman's motion for summary adjudication must be denied.

19      Moreover, even assuming Friedman did not have to demonstrate substantial

20  similarity, he must nonetheless prove that no reasonable jury could find that Guetta's works

21  incorporating aspects of the Photograph were "fair use." When an alleged infringer's use

22  is fair it "is not an infringement of copyright." 17 U.S.C. § 107. As Friedman did not submit

23  any evidence to demonstrate that Guetta's use was not fair, he has failed to meet his

24  burden of production and Guetta is not required to provide anything in response. Friedman

25  was well aware that Guetta would argue fair use because Guetta specifically indicated as

26  much in his motion to compel further responses to discovery. DMF No. 60. Friedman's

27  motion for summary adjudication does not provide any excuse for completely ignoring this

28  essential aspect of the case.

1    For these reasons, Friedman has failed to meet his burden of production. His motion

2    for summary adjudication should be denied on those grounds.

3    **B.    GUETTA DID NOT INFRINGE ON THE PHOTOGRAPH'S COPYRIGHT AS**

4    **HIS WORKS DID NOT INCORPORATE PROTECTED ASPECTS**

5    Even if Friedman were somehow relieved of his burden of production, his motion for

6    summary adjudication fails as Guetta's works do not incorporate the protected aspects of

7    the Photograph. Guetta has moved for summary judgment (or partial summary judgment

8    as to each particular category of work) in his favor in this regard. For purposes of this

9    motion, however, Guetta need only show that there is a triable issue regarding substantial

10   similarity.

11   While a two-part analysis (an extrinsic test and an intrinsic test) is applied at trial to

12   determine whether two works are substantially similar,"a plaintiff who cannot satisfy the

13   extrinsic test necessarily loses on summary judgment, because a jury may not find

14   substantial similarity without evidence on both the extrinsic and intrinsic tests." Kouf, *supra*,

15   16 F.3d at 1045. The extrinsic test "considers whether two works share a similarity of ideas

16   and expression based on external, objective criteria." Smith v. Jackson, 84 F.3d 1213,

17   1218 (9th Cir. 1996). "In applying the extrinsic test, we must distinguish between the

18   protectable and unprotectable material because a party claiming infringement may place

19   'no reliance upon any similarity in expression resulting from unprotectable elements.' " Rice

20   v. Fox Broadcasting Co., 330 F.3d 1170, 1174 (9th Cir. 2003) quoting Apple Computer,

21   *supra*, 35 F.3d at 1446. Once the court has determined the amount of protected attributes

22   of the original work that have been incorporated into the allegedly infringing work, the court

23   then applies any limiting doctrines, such as *scènes à faire* (discussed below). Reece v.

24   Island Treasures Art Gallery, Inc., 468 F.Supp.2d 1197, 1204 (D. Haw. 2006). The court

25   then "must define the scope of the plaintiff's copyright-that is, decide whether the work is

26   entitled to 'broad' or 'thin' protection," based on whether the majority of the elements are

27   protected. Id.; Satava v. Lowry, 323 F.3d 805, 812 (9th Cir. 2003).

28   While copyright protection has been afforded to photographs, not all aspects of a

1  photograph are protected. "The protectable elements of a photograph generally include

2  lighting, selection of film and camera, angle of photograph, and determination of the

3  precise time when the photograph is to be taken." Reece, at 1206, citing 1 Melville B.

4  Nimmer & David Nimmer, Nimmer on Copyright, § 2.08[E][1], at 2-130 (1999). The Ninth

5  Circuit has stated that elements that may be afforded copyright protection in a photograph

6  include " 'selection of subject, posture, background, lighting, and perhaps even perspective

7  alone as protectible elements of a photographer's work.' " Los Angeles News Service v.

8  Tullo, 973 F.2d 791, 794 (9th Cir. 1992) quoting United States v. Hamilton, 583 F.2d 448,

9  452 (9th Cir.1978).[3] Other circuits have provided similar holdings as to what elements of

10  a photograph are protected. In Leibovitz v. Paramount Pictures, Corp., 137 F.3d 109, 116

11  (2d Cir. 1998), the court held that a photographer is entitled to protection for "such artistic

12  elements as the particular lighting, the resulting skin tone of the subject, and the camera

13  angle that she selected." Id. at 116.

14      Of course, to be protected the elements of a photograph must be original. "A

15  copyright in a photograph derives from 'the photographer's original conception of his

16  subject, not the subject itself.' " Psihoyos v. National Geographic Society, 409 F.Supp.2d

17  268, 275 (S.D.N.Y 2005) quoting Kisch v. Ammirati & Puris Inc., 657 F.Supp. 380, 382

18  (S.D.N.Y.1987). Leibovitz, supra, concerned the use of a photograph of a pregnant Demi

19  Moore taken by the plaintiff, Annie Leibovitz, that appeared on the cover of Vanity Fair. The

20  defendant movie studio commissioned a billboard campaign for the film "Naked Gun 33

21  _____

22      [3]    With respect to "perspective alone" as a potentially protected element of a
photograph, it is unclear what is meant and where such authority was derived. That

23  comment first appeared in United States v. Hamilton, a case involving the criminal
copying and selling of a copyrighted map. In holding that a map could be afforded

24  copyright protection, the Court made a passing comment regarding protectable
elements of a photograph and generally cited two cases, Burrow-Giles Lithographic Co.

25  v. Sarony, 111 U.S. 53 (1884) and Time, Inc. v. Bernard Geis Associates, 293 F.Supp.

26  130, 141-43 (S.D.N.Y.1968), neither of which state or stand for proposition that
"perspective alone" may be a protectable element of a photograph. Several decisions

27  have quoted the language from United States v. Hamilton, but there has not been any
explanation as to what "perspective alone" means and there has been no explanation

28  as to the basis for that proposition or why it should be upheld.

1/3," which included images of the movie's male star's head attached to a pregnant female body, which bore significant resemblance the photograph taken by Leibovitz. The subsequent work was created by photographing a different pregnant model, but "[g]reat effort was made to ensure that the photograph resembled in meticulous detail" the original. Id. at 111. While undertaking a fair use analysis, the court discussed the protected elements of Leibovitz's photograph and held that Leibovitz was not entitled any protection for the "photograph of a nude, pregnant female. Only the photographer's particular expression of such a body is entitled to protection." Id. at 115-16. With respect to the pose struck by Demi Moore, which was reminiscent of Botticelli's "Birth of Venus," the Leibovitz court held that "the basic pose of a nude, pregnant body and the position of the hands, **if ever protectible**, were placed into the public domain by painters and sculptors long before Botticelli." Leibovitz, 137 F.3d at 115 (emphasis added). Similarly, in Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F.Supp.2d 382, 392-393 (S.D.N.Y. 2005), the court held that the positioning of a woman's legs while seated on the toilet with her feet in high heels were slightly pointed inward, while seemingly unique and unnatural, was "clearly not original" as other similar images had been published.

In Reece, supra, the plaintiff had taken and marketed a photograph of a woman performing a particular hula movement on the beach. The defendant had created and displayed a stain glass art-work depicting a woman in similar garb on the same beach performing the same hula movement from the same angle. Reece, 468 F.Supp.2d at 1200-1201.[4]  The Court held that "the protected elements of Plaintiff's [photograph] are limited to those that derive from the Plaintiff's expression of the idea of a hula dancer performing the ' ike motion. Plaintiff's expression of those ideas include the angle, timing, and lighting

---

[4]     See also Reece at 1204: "Each [work] captures a woman performing hula on the beach, kneeling in the sand in the midst of an ' ike movement, with the right arm outstretched and an open left hand against the face. The women are each adorned in the traditional hula kahiko fashion and their long dark hair flows behind them. And each image presents the woman from the same angle and orientation, from a perspective that is facing the left side of her body, as if in profile."

1   of the photograph, as well as the expression of the hula kahiko performance and dress."

2   Id. at 1206. The Court then went on to explain that elements particular to the hula tradition

3   are *scènes à faire*. Id. at 1207. The *scènes à faire* doctrine holds that "when similar

4   features are indispensable and naturally associated with, or at least standard, in the

5   treatment of given idea, they are treated like ideas and are therefore not protected by

6   copyright." Id. at 1206-1207 citing Rice, *supra*, 330 F.3d at 1175 and Apple Computer, Inc.,

7   35 F.3d at 1444. Thus, despite the obviously similarity between the photograph and the

8   stain glass art-work, the Court held that the Plaintiff could not demonstrate the likelihood

9   that he would prevail on his copyright infringement claim for purposes of an injunction.

10          With these concepts in mind, it is clear that few of the Photograph's elements that

11   may be protected were incorporated into Guetta's works, and the few protectable aspects

12   that were incorporated were unoriginal and, therefore, not protected. With respect to the

13   Records Work, Stencil Works and Banner Work, by essentially only using an outline of the

14   features of Run-DMC, Guetta's works eliminate the technical aspects of the photograph

15   including the choice of camera and film, lighting, shading, the subjects' resulting skin tone.

16   The Photograph's crisp black and white qualities have been eliminated. There is no

17   nuanced shading in the subjects' skin tone. Similarly, the Old Photo Work, which only

18   incorporates two members of Run-DMC, has a sepia tone and does not reflect the crisp

19   black and white imagery of the Photograph. The background of Photograph was not

20   incorporated into any of Guetta's works. Run-DMC's pose is not protected as it is  not

21   original: one member with his fist cupped, another other with his arms crossed. These

22   poses were put into the public domain long before the Photograph was taken. Indeed, the

23   pose of the member on the right of the Photograph (Run) is commonly referred to as the

24   "B-Boy Stance" in hip-hop culture and Friedman testified that he had seen Run posed in

25   the "B-Boy Stance" previously. DMF No. 61. Friedman "quite possibly" told the member on

26   the left (DMC) to cup his fist and could only testify that he "most likely" put the group in their

27   precise pose. DMF No. 62.

28          Additionally, pursuant to the *scènes à faire* doctrine, the elements of a photograph

---

GUETTA\MSA OPP P&A

**DEFENDANT'S OPPOSITION TO
MOTION FOR SUMMARY ADJUDICATION**

that "follow naturally from the work's theme rather from the author's creativity" are also not protected. Psihoyos, *supra*, 409 F.Supp.2d at 274. Run-DMC's pose in the Photograph is entirely conventional when compared to the countless other photographs of Run-DMC above that display similar bravado. Friedman admitted that Run-DMC tended to wear matching clothes prior to the Photograph being taken and that Friedman did not come up with that idea (or the use of Stetsons). Accordingly, the limiting doctrine of *scènes à faire* further weighs against copyright infringement and the Photograph should be provided only "thin" protection, as the elements incorporated into Guetta's works are not protected.

Additionally, certainly with respect to the Old Photo Work, there is at least a triable question of fact as to whether the intrinsic test for substantial similarity would support a finding of no copyright infringement. The intrinsic test "asks whether an 'ordinary, reasonable observer' would find a substantial similarity of expression of the shared idea." Smith, *supra*, 54 F.3d at 1218. Clearly, an ordinary, reasonable observer may find that the Photograph of Run-DMC does not share substantial similarity of expression with the Old Photo Work, which contains two altered images of the members of Run-DMC with two family members from the 19th century.

Without a doubt, Friedman has not demonstrated that there is no triable issue of copyright infringement.

### C.   FAIR USE

Guetta may also defeat Friedman's motion for summary adjudication by demonstrating that a triable issue exists with respect to his fair use defense. The Copyright Act of 1976 (17 U.S.C. §§ 101-803) first codified the fair use defense to copyright infringement.  Id. at § 107. When an alleged infringer's use is fair it "is not an infringement of copyright." Id. 17 U.S.C. § 107 enumerates the following four non-exclusive factors that are to be considered in determining whether use of a copyrighted material is fair:

"(1) the purpose and character of the use, including whether such use

is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

1   "(3) the amount and substantiality of the portion used in relation to the

2   copyrighted work as a whole; and

3   "(4) the effect of the use upon the potential market for or value of the

4   copyrighted work."

5   The court must balance each of these factors to determine whether the use was fair.

6   Mattel, Inc., *supra*, 353 F.3d at 800 ("To determine whether a work constitutes a fair use,

7   we engage in a case-by-case analysis and a flexible balancing of relevant factors.").

8   The seminal case in the modern application of the fair use doctrine is Campbell v.

9   Acuff-Rose Music, Inc., 510 U.S. 569 (1994). The U.S. Supreme Court in Campbell

10  analyzed the public policy underlying the fair use doctrine: "From the infancy of copyright

11  protection, some opportunity for fair use of copyrighted materials has been thought

12  necessary to fulfill copyright's very purpose: 'To promote the Progress of Science and

13  useful Arts.' " Id. at 575, quoting Article I of the United States Constitution. The court

14  explained that while providing authors with a monopoly over their creative works provided

15  incentive for creating them, the fair use doctrine was created so as " 'to avoid rigid

16  application of the copyright statute when ... it would stifle the very creativity which that law

17  is designed to foster.' " Id. at 577 quoting Stewart v. Abend, 495 U.S. 207, 236 (1990).

18  With respect to the first fair use factor, the purpose and character of the use,

19  Campbell court explained that a chief question is whether the work is "transformative,"

20  whether the new work simply "supercedes the objects" of the original work or if the use

21  "adds something new, with a further purpose or different character, altering the first with

22  new expression, meaning or message." Campbell, at 579. In other words, whether the use

23  is "supplanting" the original. Id. Although an important factor, a finding that a use is

24  transformative is not necessary to prevail on a fair use defense. Id. Whether the use is

25  commercial is also a consideration under the first fair use factor, but is weighed on a sliding

26  scale with the degree to which the use is transformative. Id.

27  As to the second fair use factor, the nature of the copyrighted work, Campbell

28  recognized "that some works are closer to the core of intended copyright protection than

1   others, with the consequence that fair use is more difficult to establish when the former

2   works are copied." Id. at 586. Addressing the amount and substantiality of the portion used,

3   the third fair use factor, the Campbell court explained that the analysis "calls for thought

4   not only about the quantity of the materials used, but also about their quality and

5   importance, too." With respect to the fourth fair use factor, effects on the market for and

6   value of the copyrighted work, Campbell held that the "cognizable harm is market

7   substitution" and that there is no presumption of market harm, even when a commercial

8   use has been established. Id. at 570.

9        Since Campbell, only a handful of decisions have applied the fair use doctrine in

10  cases involving the artistic use of copyrighted photographs. The material facts presented

11  in Blanch v. Koons, 467 F.3d 244 (2d Cir. 2006), are substantially similar to those

12  presented in the instant action. In Blanch, the defendant Koons was a so called

13  "appropriation artist," one who incorporates existing copyrighted materials into his art

14  works. At issue was a piece Koons created that was commissioned by Deutsche Bank for

15  display in Germany entitled "Niagra," a painting that consisted of "fragmentary images

16  collaged against the backdrop of a landscape." Id. at 247. Koons employed a process

17  similar to Guetta in creating his work: he took images of four pairs of women's legs taken

18  from fashion magazines and scanned them into a computer, made certain modifications

19  to the images and then used them as the foreground for "Niagra." The background

20  consisted of images of pastries such as brownies, donuts and danishes. The copyright

21  owner of the image of one of the pair of legs used in the foreground filed suit. Her picture

22  originally appeared in Allure magazine and it included a woman's lower legs and feet

23  resting in a man's lap in a first-class airplane cabin.

24       In addressing the test set forth in Campbell as to whether the use merely

25  superceded the original work or if it altered the original with new expression, meaning or

26  message, the Blanch court held:

27       "The test almost perfectly describes Koons's adaptation of [the original work]:

28       the use of a fashion photograph created for publication in a glossy American

16

1
2
3
4
5

'lifestyles' magazine with changes of its color, the background against which it is portrayed, the medium, the size of the objects pictured, the objets' details and, crucially, their entirely different purpose and meaning-as part of a massive painting commissioned for exhibition in a German art-gallery space. We therefore conclude that the use in question was transformative."

6

Id. at 253.

7
8
9
10
11
12
13
14
15
16
17

In addition to determining that Koons' work was transformative, the Blanch court considered the commercial nature of the use in addressing the first fair use factor. Citing Campbell, the Blanch court rejected that idea that the commercial nature of a use of copyrighted material could be dispositive on its own, as nearly all secondary uses are generally conducted for commercial reasons. Id. at 254 quoting Cambell, 510 U.S. at 584. Accordingly, the court in Blanch did not give much weight to the commercial nature of Koons' work. Blanch, 467 F.3d at 254.  Moreover, the Blanch court explained that fair use is more likely to exist where the use "produces a value that benefits the broader public interest." Id. at 253.  The court held that the exhibition of the defendant's work in the German bank constituted a public benefit, further reducing the commercial nature of the use. Id. at 254.

18
19
20
21

The final aspect considered by the Blanch court in determining which party the first factor favored was Koons' alleged bad faith in using the photograph. The court held that this consideration is essentially meaningless, as no permission to use a work is necessary if the use is fair.  Id. at 256, citing Campbell, 510 U.S. at 585, n. 18.

22
23
24
25
26
27
28

As to the second fair use factor, the Blanch court explained that there are two main inquiries: whether the original work is creative or banal and whether the original was published or not. Blanch, 467 F.3d at 256. Although disagreeing with the trial court's assessment that the original photograph was banal and accepting that it was creative, the Blanch court nonetheless held that it had little impact on the overall analysis.  Id. at 257

1
2
citing Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 612 (2d Cir. 2006)[5] and Campbell, 510 U.S. at 586.

3
4
5
6
7
8
9
In holding that the amount of the original that was used was reasonable, the third fair use factor, the Blanch court noted that Koons did not "copy those aspects of [the original work] 'whose power lies in [the plaintiff's] individualized expression.' " Blanch, 467 F.3d at 257-58 quoting Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 563 (1985). The plaintiff in Blanch testified that her key creative decisions were the airplane setting and placement of the legs on a male lap, background features that were not used in the work Koons created. Blanch, 467 F.3d at 258.

10
11
12
13
14
15
16
17
18
19
20
21
22
Finally, with respect to the fourth fair use factor, market effects, the Blanch court, quoting NXIVM Corp. v. Ross Inst., 364 F.3d 471, 481-82 (2d. Cir. 2004), explained that " 'our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work.' " Additionally, quoting Campbell, 510 U.S. at 592, the court held that "[t]he market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." Blanch, 467 F.3d at 258. The plaintiff had never subsequently published the photograph after its initial appearance in Allure and had never licensed any of her works for use in other artistic mediums. The court found that the use of her work by Koons did not cause harm to the value of the original photograph or any other photographs the plaintiff took, and the use did not harm the plaintiff's career in any manner. Therefore, the Blanch court held that the use "had no deleterious effect" upon the potential market for the photograph. Id.

23
24
25
26
Leibovitz, supra, also concerned a fair use defense in an action wherein an original photograph was used in a subsequent work. As explained above, that case involved a movie studio's commissioning of a billboard campaign for the film "Naked Gun 33 1/3," that

27
28
---

    [5]    In Bill Graham Archives, the court, quoting Campbell at 586, held "the second factor is not 'likely to help much in separating the fair use sheep from the infringing goats ... ' "  448 F.3d at 612.

1  was similar to the photograph of Demi Moore taken by Leibovitz. The court held the first

2  factor favored fair use, despite "some discount due to the fact that it promotes a

3  commercial product." Id. at 115.  As with Campbell and Blanch, the court gave little weight

4  to the second factor.  Id.

5      In discussing the third factor pertaining to the amount and substantiality of the use

6  of the original work, the court stated that "consideration must be given not only to the

7  quantity of the materials taken but also to 'their quality and importance' to the original

8  work." Id. at 114 quoting Campbell, 510 U.S. at 587. The court further stressed that in

9  considering the third factor, only **protected elements** of the original are to be considered.

10  Leibovitz, 137 F.3d at 115. The court held that Leibovitz was not entitled to any protection

11  for the "photograph of a nude, pregnant female. Only the photographer's particular

12  expression of such a body is entitled to protection" and explained that a photographer is

13  entitled to protection for "such artistic elements as the particular lighting, the resulting skin

14  tone of the subject, and the camera angle that she selected." Id. at 115-116. Again, with

15  respect to Demi Moore's pose, the Court held that "the basic pose of a nude, pregnant

16  body and the position of the hands, **if ever protectible**, were placed into the public domain

17  by painters and sculptors long before Botticelli." Id. at F.3d at 115 (emphasis added). While

18  the court in Leibovitz held that the defendant used more of the protected features of the

19  plaintiff's photograph (lighting, skin tone, etc.) than necessary to achieve its goals, that still

20  was not sufficient to determine that the third factor favored the plaintiff.

21      As to the fourth factor, the only market harm alleged by Leibovitz was that she had

22  been deprived of a licensing fee for using her work as an advertisement, but the court held

23  that she was not entitled to a licensing fee for a work that otherwise qualifies as fair use.

24  Id. at 117, citing Campbell at 592.

25      Based on the foregoing, the following fundamental propositions regarding the fair

26  use defense to copyright infringement may be extrapolated:

27      (1)    With respect to the first factor (purpose and character of the use), the primary

28  concerns are whether the work is transformative (i.e. "adds something new, with a further

purpose or different character, altering the first with new expression, meaning or message") and whether there is a commercial nature to the use;

(2)     The second factor (nature of the copyrighted work) is given little weight;

(3)     As to the third factor (amount of copyrighted work that is used), only **protected** elements of the copyrighted work are to be considered. In the case of photographs, these elements tend to be the lighting, film, camera and other choices photographers make and the resulting skin tones and shading of the photographs; and

(4)     With respect to the fourth factor (market effects), the use must have a "deleterious effect" upon the copyrighted material's potential market for favor a finding that a use was not fair.

**D.     APPLICATION OF THE FAIR USE DEFENSE TO GUETTA'S WORKS**

**1.     The Old Photo Work**

The Old Photo Work, which consists of the photograph of the 19th century family with two members of Run-DMC included, is unquestionably transformative. The artistic interpretations that can be ascribed to the Photograph and the Old Photo Work are entirely different. The Photograph typifies the kinds of images of Run-DMC that were created and disseminated in the 1980s: it shows a streetwise hip-hop group, full of machismo. Many similar photographs were created throughout the group's tenure in order to transmit the group's image. The purpose of those photographs was to appeal to consumers of hip-hop culture and create market demand for Run-DMC's brand. Friedman testified that his purpose in creating the Photograph was to inspire others as he had been inspired by Run-DMC's music.

The Old Photo Work cannot possibly be seen as a work to inspire hip-hop enthusiasm the way Friedman intended. The inclusion of the  19th century family with their faces and bodies conveying little emotion sharply contrasts with the bravado displayed by the images of the Run-DMC members. The Old Photo Work can reasonably be seen as poking fun at the "tough-guy" image Run-DMC and countless other hip-hop acts have used to promote themselves. Another reasonable interpretation is that Old Photo Work is

mocking the modest nature of the 1800's family and the society in which they existed. A viewer may see the Old Photo Work as posing the question: what would it be like if the paragon of modern-day bravado was sent back in time to a more restrictive era? The contrast of the images of Run-DMC and 19th century persons is undeniable. The Old Photo Work may also implicate thoughts regarding race relations through different eras. A multitude of reasonable interpretations may be drawn from the Old Photo Work. On the other hand, the Photograph is closed to such a wide array of artistic meanings. Clearly, the Old Photo Work has not simply supplanted the Photograph and has added "something new, with a further purpose or different character, altering the first with new expression, meaning or message." Campbell, 510 U.S. at 579. Therefore, the Old Photo Work is substantially transformative.

With respect to the commercial nature of the Old Photo Work, Guetta did not receive a six-figure commission to create the work, as did Koons with respect to the work at issue in Blanch (wherein the court determined the first fair use factor favored the defendant),[6] although Guetta did sell some prints of the Old Photo Work. Moreover, as with the work at issue in Blanch, the Old Photo Work was displayed in a public forum (with no admission fee), thereby creating "a value that benefits the broader public interest." Blanch, 467 F.3d at 253.  Furthermore, in light of the highly transformative nature of the Old Photo Work, the commercial nature of the Old Photo Work is discounted. Id. at 254.

With respect to the Old Photo Work, the first fair use factor clearly weighs in favor of Guetta. Moreover, as the Old Photo Work is substantially transformative, the remaining fair use factors must be given less consideration.

As with each of the cases cited above, the court should not give much weight to the second fair use factor as "the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." Bill Graham Archives, 448

---

[6]     In Blanch, it was determined that Koons' net compensation attributable solely to the work at issue (i.e. not including several other works that Koons created around the same time for the same German bank installation) was $126,877. 467 F.3d at 248.

F.3d at 612.

The third fair use factor, amount and substantiality of the copyrighted work used, clearly weighs in favor of Guetta. Old Photo Work consists primarily of the 19th century photograph with two of the family members removed and the inclusion of images of two Run-DMC members from the Photograph that have been somewhat altered. The background of the Photograph is not used at all. Moreover, the Old Photo Work does not capture the elements attributable to Friedman's decisions regarding lighting, lens and shutter-speed, which give the Photograph its particular expression, including color, clarity and the subjects' resulting skin tone. Here, all of those individualized aspects of the photograph have been eliminated. The shading and crisp black and white imagery of the Photograph is gone. The images of the two Run-DMC members are muted and given the same sepia tone as the 19th century photograph. The skin tone of the members of Run-DMC does not resemble the result Friedman captured in the Photograph. Based simply on the image's color and appearance (and considering the temporally inappropriate clothing), a viewer would assume the subjects of the Old Photo Work, including the two Run-DMC members, were photographed with a camera well over a hundred years old, rather than with photography equipment available during the 1980's.

Run-DMC's pose is not protected. First of all, it is unlikely that any pose is ever protectible. Leibovitz, supra, 137 F.3d at 115. Moreover, the posing of the members of Run-DMC in the Photograph is not particularly original: one member with his fist cupped, another other with his arms crossed in the "B-Boy stance." By Friedman's own admission, the poses were put into the public domain before the Photograph was taken and Run-DMC had already posed similarly in photographs. Friedman does not have a protected interest in the generic tough-guy pose depicted in the Photograph. Friedman's choice of background was not incorporated at all.

Much of the Photograph was not used creating in the Old Photo Work and none of the Photograph's *protected* expression was used. The third factor favors fair use.

As to market effects, it is hard to fathom how the Old Photo Work could possibly

usurp the market for the Photograph. Indeed, Friedman testified that he is not aware of the lack of any purchase or use of the Photograph due to Guetta's use.  Moreover, any person that wants a copy of Friedman's Photograph will undoubtedly be unsatisfied with the Old Photo Work, as it excludes one of Run-DMC's members and includes two unidentified people from the 1800's and does not depict the lighting, skin tone and other subtleties of the Photograph. The Photograph is a glossy depiction of a rap group full of hubris, the Old Photo Work is something completely different. To the extent the Old Photo Work usurped the market for photographs of Run-DMC, the right to publicity lies with the group and Friedman has no standing to assert a claim on their behalf. Also, to the extent that the market for the Photograph has been diminished because of any perceived criticism contained in Old Photo Work, as with a "lethal parody" or "scathing theater review," no cognizable harm under the Copyright Act is produced. Campbell, 510 U.S. at 591-592.

Finally, the Old Photo Work may actually produce interest in the Photograph to the extent people are interested in the images Guetta has incorporated into his works, thereby positively affecting the market for the Photograph.

Simply stated, the markets for the Photograph and the Old Photo Work are different and  the Old Photo Work has not become a market replacement for the Photograph or the books in which it appears. Therefore, the fourth fair use factor also favors Guetta.

Based on the foregoing, the Old Photo Work's use of the Photograph was fair.

### 2.    The Broken Records Work

In addition to being transformative, as explained below, the first fair use factor strongly favors Guetta with respect to the Broken Records Work (the piece consisting of over 1,000 pieces of broken records) as there is no commercial aspect to the use.  Unlike the Old Photo Work, the Broken Records Work was never offered for sale in any manner. Other than being displayed at the "Life is Beautiful" show for approximately two and a half months in the Summer of 2008, the Broken Records Work was not displayed or used for any commercial purpose. Guetta was not paid to put on the show and admission was free. The Broken Records Work was never used promote Guetta or his work. Rather than

23

1   capitalizing financially, Guetta served a broader public interest by displaying his art.

2       Additionally, the use was transformative. Given that the Broken Records Work was

3   only displayed at the "Life is Beautiful" show, it must be viewed in that context. The Broken

4   Records Work was one of approximately 200 pieces that were displayed during the

5   installment. As with the image of the poster used in the book in Bill Graham Presents, the

6   copyrighted image made up only a tiny fraction of the entire show, which contained many

7   more works that were far more grandiose. Therefore, the use was inconsequential. Bill

8   Graham Presents, 448 F.3d at 611. Additionally, the background of the Photograph has

9   been omitted, as have all the protected elements attributable to Friedman such as skin

10  tone, shading and detail. Moreover, the Broken Records Work applies the image of Run-

11  DMC to an entirely new medium. The broken records create a topographical component

12  to the work. In addition to an aesthetic change, the use of records can provide the viewer

13  with various interpretations of the work that cannot reasonably be applied to the

14  Photograph. One may understand the Broken Records Work to be a commentary on the

15  declining state of the recording business with its use of records, a listening format many

16  consider to be outdated, that are broken. The use of records may also be seen as an

17  homage to the importance vinyl records played in the development of hip-hop culture.

18  Again, numerous reasonable artistic interpretations may be attributed to the Broken

19  Records Work that cannot be attributed to the Photograph. Therefore, the Broken Records

20  Work is transformative. As discussed previously, the second fair use factor should not be

21  given much weight.

22      As to the third factor, while the Broken Records Work uses each of the members

23  of Run-DMC, it does not use any of Friedman's protected expression in their images.

24  Again, through the process of creating the piece, all shading and detail has been removed.

25  Any of Friedman's artistic choices as a photographer are not present in the Broken

26  Records Work.

27      It is all but impossible for the Broken Records Work to have any effect upon the

28  market for the Photograph. It is not fathomable that a person with some interest in

purchasing the Photograph (or a book containing the Photograph) would refrain from doing so because of the display of the Broken Records Work at an art exhibit.  No person's appetite for the protected aspects of the Photograph would be satiated by the temporary showing of a piece entirely devoid of Friedman's artistic input.

### 3.   The Stencil Works

Only one of the Stencil Works was ever displayed during the "Life is Beautiful" exhibition and the images were never offered for sale in any manner, so there is no commercial use associated with those works. Additionally, the work that was displayed is transformative as it was only a tiny fraction of the patchwork making up the "Life is Beautiful" show and must be viewed in that context. Again, the second fair use factor should be given little weight. With respect to the third factor, as with the other works previously addressed, the Stencil Works do not use the Photograph's protected expression. The background, Run-DMC's skin tone and all other details provided by Friedman's artistic decisions as a photographer have been eliminated. As with the Broken Records Work, the display of the one Stencil Work at an exhibition would not have a deleterious effect on the market for the Photograph.

### 4.   The Banner Work

The Banner Work was sold, but still displayed after it was sold. Accordingly, it has both a commercial and non-commercial character. As with the other works, the protected elements of the Photograph are not incorporated. Finally, the display of the Banner Work at art shows cannot have a deleterious effect on the market for the Photograph.

## IV.   CONCLUSION

Based on the foregoing, Friedman's motion for summary adjudication must be denied.

Dated: April 18, 2011                    LAW OFFICES OF ALAN S. GUTMAN

                                         /s/ Alan S. Gutman
                              By: _____
                                         Alan S. Gutman
                              Attorneys for Defendant and Counter-Claimant
                              THIERRY GUETTA a/k/a MR. BRAINWASH